## WIGGINS v. THE STATE OF GEORGIA.

1. Refusal of a continuance for the absence of a physician who had testified at the coroner's inquest, was not error, where the testimony expected to be given by him was such as might have been shown by any other physician, and where the only means taken to procure his attendance was the placing of a *subpœna* in the hands of the sheriff, counsel having been assigned to the accused several days before the case was called; although it was shown that the witness lived either in Georgia or Florida.
2. The verdict, guilty of murder, is supported by the evidence, and is not contrary to law.
3. Though requests to charge be legal, refusal to give them is not error if they are fully covered by the charge as given, which omits no defence or theory of the accused and is as favorable to him as he has any right to expect.

March 1, 1890.

Murder. Criminal law. Continuance. Verdict. Charge of court. Before Judge FORT. Sumter superior court. May term, 1889.

Robert Wiggins was charged with having murdered John H. Williams on December 18, 1888, in Sumter county, "in some way and manner and by some means, blunt instruments and weapons to the jurors unknown." The evidence introduced by the State tended to show the following: On the morning of the day the deceased was killed, he was given $28 wages, in three bills and three silver dollars, which he left in the custody of a person with whom he had been working. Three days before, he had been paid between eight and twelve dollars. On the 18th of December, about an hour by sun, deceased and defendant were seen in Americus, sitting and laughing together. Deceased was drinking but not drunk. Defendant had come to town with one Stewart, for

whom he had been working, and to whom he was then indebted. He told Stewart he had no rations and no money to get any, and was obliged to get something to eat before he could work. Stewart tried to dissuade him from going to town, but defendant said no, he had nothing to do. Stewart gave him forty cents to buy some meat, and he went into a store and got it and then came back and got into the buggy with Stewart. After an interval, during a part of which Stewart was absent, leaving defendant with the mule and buggy, they drove towards home. Just out of town they saw deceased staggering drunk. He had some oranges, and asked defendant to take them and give them to his folks and tell them that he would be on some time in the night. Defendant took them, and he and Stewart drove on, but deceased went into the creek. Seeing this, Stewart told defendant he had better go and get deceased out of there and carry him home. Defendant said that he would go back and get him, and got out of the buggy and went in a run. Stewart drove on, and when last he saw them defendant had not reached deceased. One Turpin, on the same evening saw deceased and defendant together at the creek about a mile and a half from where deceased was afterwards found dead, and about two hours before Turpin afterwards saw him dead. Deceased was drunk and was shaking himself as if he was about to fall. Defendant told him he had been in the creek; he said he had not; defendant said, "Yes you have, look at your pants," felt of deceased's pants and asked him if he had lost his pistol; deceased said no; defendant said, "Yes you have, I am going to see." After a while, defendant asked deceased if he did not want a drink of whiskey. Deceased was shaking, and defendant caught hold of him and told him, with an oath, to stand still if he was going to drink it; deceased took a drink and fell straight out in the road. He got

up and the two went on; and when Turpin last saw them they had reached the bridge. They locked arms and went off singing. A short time before the killing, one Marshall met defendant and deceased walking, on the other side of the creek from Americus, about a mile from town. Defendant had deceased by the arm. Deceased seemed to be drunk and defendant sober. It was then growing dark. Deceased was pulling back and defendant pulling him along. Deceased asked Marshall to take him home in his wagon, and Marshall replied that he would be back directly and would take him. He was not going willingly with defendant, but was pulling back and calling Marshall. Defendant saw Marshall, pulled his hat down over his face and did not speak; nor did Marshall speak to him, though they knew each other. They had had a little falling out. One Robinson saw defendant and deceased together on the same evening but little before dark, about a quarter of a mile from the city line, going towards Turpin's. Deceased seemed to be drunk and defendant did not appear to be so. Deceased had a little bundle in his hand like apples or oranges, and was asking defendant would he not give somebody some of it and defendant told him yes. Deceased was not pulling back, but was walking along and talking. He told defendant he had money. They were then nearly to the railroad and about 200 or 250 yards from where deceased was found dead, and it was not more than a half an hour afterwards when Robinson heard of the body having been found. Turpin told him about it. The body was found between 7 and 8 o'clock, near the house of Turpin, by Elias Adams, in the railroad cut four or five feet deep, where the public road crossed the railroad, lying in a little trench two to three feet from the railroad track. The deceased was lying on his face, with mud on the front of his clothes, none on his back. Blood had run

from the side of his head under his body. No blood was seen on the railroad track. A train passed there about 9 o'clock. In the trench were signs of a scuffle, or of one trying to get up. There were no indications on the side of the cut of any person having fallen, nor any tracks or other indications at the top of the cut or embankment of any person having been there, and the soil was of such a character as to have shown tracks if a person had been on it. On the top of it was found a cap; to whom it belonged was not shown. No other wounds or indications of violence were found upon the body than a small hole in the side of the head, about large enough to admit a man's little finger. It felt as if 'it might have been made with a pistol ball, but it might have been done by striking with a stick or the sharp corner of a rock.

Between seven and eight o'clock defendant arrived, alone, at the house of Elias Stevenson, from which the house where defendant lived was about a quarter of a mile. He was apparently on his way home. He did not say where he had been, or that anybody was with him or had come with him. He went from Elias's house to supper about a mile away with George and Mary Stevenson and Amy Jackson. Elias lived about a mile from where the body was found. George was at home before night. Defendant was seen on the same night, by Elias and others, with about seven or eight dollars in silver of different denominations, and he spent money at the supper that night. He showed Mary some money which he said he got from Stewart, and desired her to keep it for him; and showed George $7.75, saying he made it picking cotton in another county. He also told Mary that he had whiskey in a flask, but did not give her any, though he had given her whiskey before. He gave some to George, and offered some to Elias. George and defendant returned together from the supper to defend-

ant's house, where they separated, George going home. When in about 200 yards of his father's house, he met the sheriff, who was hunting for the man that had been seen with the deceased, having been notified of the killing about half past nine o'clock, and having reached the corpse a little after ten. He told George that a man had been found dead and carried him to see if he knew who the man was. He recognized the deceased, and the sheriff told him to go back and tell deceased's wife to come there and see after him. It was then about midnight. George went and told his mother to go and notify them all. He had to go by defendant's house; he arrived there at three o'clock, and called defendant, who came out with his clothes on. George told him that John Henry Williams was dead and that somebody had killed him. Defendant asked, "How do you know?" George said, "The sheriff carried me down there"; and then defendant grabbed George's hat and ran off, and George saw him no more until he was in jail. George saw no light in defendant's house, and noticed no blood on his clothes. The next day after the killing, one Sutton saw defendant in Stewart county. Defendant went home with Sutton and staid all night; said his name was Robert Wiggins, and afterwards said it was Henry Wiggins. He went to bed between ten and eleven o'clock, giving Sutton a pistol to put away until the next morning or until he called for it. He awoke Sutton by calling "oh lordy, oh lordy!" two or three times in his sleep. Sutton asked him what was the matter; he replied that he was troubled, that a man did not know what trouble was until he got into it; he did not say anything more. He staid there until the next afternoon, when he was arrested. He said that he came from Americus, that he had walked part of the way and rode upon the train, and that he had ten dollars. Sutton never saw the money. He came to be

stopping at Sutton's house because he was recommended by William Clarke, to whom he was known and whose wife being sick was the reason why defendant could not stay with him. He seemed to have no disposition to go away, except that he said he had an engagement to go to Columbus with Clarke. Two days after the killing, he told one Brown that he had walked all the way from Americus to Randall's crossing in Stewart county, about twenty miles, and that he had got into trouble in Americus; he said "him and a fellow got into a fuss and he knocked him in the head with a piece of scantling." Brown asked if he killed him; defendant said, if he did he did not know it, that he left afraid he would die. When arrested, defendant said his name was William Wright, and told Sutton to go and tell Clarke to meet him at the train and that he would let him have the money he had promised him, that he had promised to let Clarke have twenty dollars, and that he had between twenty-five and thirty dollars, which he had got for work upon the railroad. The person who made the arrest found two silver dollars in his buggy the next morning, but did not know what became of the rest of the money which defendant said he had. Defendant was carried before one Holder, who read to him a description from a newspaper. He laughed, denied being or knowing Bob Wiggins, and said he did not know the man who was killed and never heard of him before. He told Holder he had two dollars, felt in his pockets and did not find it, and afterwards found a hole in his pocket and thought he had probably lost it in that way. The sheriff asked him where he had last seen John Henry Williams when he went out from town with him. Defendant said he left him at Elias Stevenson's house, that when they got there defendant went in the house and deceased went on towards home.

After verdict of guilty and sentence to life imprisonment, the defendant moved for a new trial on the grounds

stated in the decision. The motion was overruled, and exception was taken.

ANSLEY & ANSLEY and HOOPER & HIXON, for plaintiff in error.

C. B. HUDSON, solicitor-general, for the State.

BLANDFORD, Justice.

The plaintiff in error was indicted for the crime of murder; he was placed upon his trial, and found guilty by the jury. He moved for a new trial upon several grounds, which motion was overruled by the court, and he excepted.

1. One of the grounds of the motion is, that the court committed error in refusing to grant a continuance on account of the absence of a witness. This witness was a physician who had testified before the coroner's inquest. It appears from the record that the accused had counsel assigned him several days before the case was called, and if any diligence had been observed by them, they could have procured the attendance of this absent witness. All the diligence shown by them was the placing of a *subpœna* in the hands of the sheriff of Sumter county; and while it was shown that the witness lived either in Georgia or Florida, no further means were taken by counsel for the accused to procure the attendance of this witness. Besides, the evidence which they proposed to show by him was such evidence as might have been shown by any other physician. We do not think the court committed error in refusing to grant a continuance of the case upon the ground stated.

2. There were various other grounds taken in the motion for a new trial, among others, that the verdict was contrary to law and the evidence, and without evidence to support it. We are satisfied from the evidence adduced on the trial of this case that there was sufficient evidence to support the verdict, and that the same was not contrary to law.

3. It is further alleged that the court committed error in some of the instructions given by it to the jury, and in refusing to give certain requests made by counsel for the plaintiff in error. We have examined carefully the whole charge of the court in this case. We are sat-isfied it is a very full, fair and able charge; that the court gave the whole law, as applicable to this case, in charge to the jury, and as favorably to the accused as he had any right to expect. There was no defence or theory of the defendant left out in these instructions to the jury, and the requests made by counsel for the plaintiff in error, while they appear to be sound law, were, in our opinion, fully covered by the charge of the court. The judgment of the court below is      *Affirmed.*