EVANS *v.* THE STATE.

No. 6428. NOVEMBER 14, 1928.

*Meredith & James,* for plaintiff in error.

*George M. Napier, attorney-general, George D. Anderson, solicitor-general, T. R. Gress, assistant attorney-general, Howard Tate, Roscoe Pickett,* and *William M. Howard,* contra.

HILL, J. Lindsey Evans, Hoyt Evans, Carter Jones, Carter Wilson, and C. L. Smith were jointly indicted for the offense of murder, the indictment charging that the accused, on September 17, 1927, with a certain shotgun did shoot one Lee Cape "in the head, face, neck, and body, thereby inflicting a certain mortal wound and certain mortal wounds, from which he, the said Lee Cape, then and there died." Hoyt Evans, one of the defendants, was placed alone on trial, and the jury returned a verdict of guilty, with a recommendation to the mercy of the court; and he was sentenced to the penitentiary for life. He made a motion for new trial on various grounds, which were overruled, and he excepted.

■ The first special ground of the motion for new trial complains of the refusal of the court to grant a motion for a continuance. This ground discloses that counsel for the plaintiff in error, in response to an inquiry by the court as to whether he was ready for trial, said that he was not. The court thereupon requested counsel to make his showing for a continuance. Counsel stated that the plaintiff in error had twenty-seven witnesses subpœnaed, that the subpœnas had just been issued by the clerk; and he stated further in his place: "These witnesses are material, and I expect to show by these witnesses material facts necessary to the defense of the four defendants now called for trial. . . I can show by the defendants what I wish to prove by each of them. I will state, when I get these witnesses or a good portion of them, I will be ready to go to trial. I think we are entitled to get these subpœnas served, in view of the fact that the indictments were returned into court late yesterday afternoon." Error is assigned upon the following ground: "Because the indictment in this case was returned into court on the 27th day of September, 1927, and the case was called on the 28th day of September, 1927, and the defendants, including the one on trial, were entitled to a reasonable time to subpœna witnesses in their behalf, and this defendant, Hoyt Evans, did not have the opportunity of subpœnaing the witnesses, nor knowing definitely what specific crime he was charged with committing, until the said indictment was returned into court; and that the forcing of the defendants into the trial of said case without the benefit of material witnesses to testify in their behalf about material facts, . . and it was error for the court not to allow them reasonable time to secure the witnesses on the statement of the defendants' counsel in his place that he was not ready, and that he had not had time to subpœna the witnesses enumerated herein." The Civil Code (1910), § 5715, provides: "In all applications for continuances upon the ground of the absence of a witness, it must be shown to the court that the witness is absent; that he has been subpœnaed; that he resides in the county where the case is pending; that his testimony is material; that such witness is not absent by the permission, directly or indirectly, of such applicant; that he expects he will be able to procure the testimony of such witness at the next term of the court; and that such application is not made for the purpose of delay,

but to enable the party to procure the testimony of such absent witness; and must state the facts expected to be proved by such absent witness." It will readily be seen that the motion for continuance did not come up to the rule so laid down. It was not shown by the oath of any one, or by counsel stating in his place, what the witnesses whose names were called would testify; it was not shown that any witness whose name was called resided within the county or within the jurisdiction of the court, or that it was possible to procure his or her attendance; it was not shown that the testimony of the witnesses was expected to be produced by the plaintiff in error by the next term of the court; it was not shown that the motion for continuance was not made for delay, and that the witnesses were not absent with the consent of the defendant, or that the motion was made for the purpose of securing the testimony of the witnesses, or what was expected to be proved by them. *Rutledge* v. *State,* 108 *Ga.* 69 (33 S. E. 812). It was not shown that the plaintiff in error, or his counsel, had used any diligence whatever in trying to procure the attendance of the witnesses named. Penal Code, § 991. The record discloses that the homicide was committed on September 17, and that the defendant was arrested and placed in jail on September 18, ten days before the case was called for trial; and no reason was shown for the failure to subpœna the witnesses in question. This court has held that before a continuance will be granted for an absent witness it must be shown that the evidence sought to be elicited is material and not indefinite or irrelevant. *Griffin* v. *State,* 26 *Ga.* 493; *Wiggins* v. *State,* 84 *Ga.* 488 (10 S. E. 1089). It has also been held that a continuance will be refused when it is not shown affirmatively that the absent witnesses whose testimony is sought will be forthcoming at the next term of the court. *Woolfolk* v. *State,* 85 *Ga.* 69 (11 S. E. 814); *Williams* v. *State,* 25 *Ga. App.* 380 (103 S. E. 685); *Howard* v. *State,* 7 *Ga. App.* 61 (65 S. E. 1076). It has likewise been held that a continuance of a case upon the ground of the absence of a witness will be refused when it is not shown that the application is not made for the purpose of delay. *Newsome* v. *State,* 61 *Ga.* 481; *Cobb* v. *State,* 110 *Ga.* 314 (35 S. E. 178). It will be observed from the motion for continuance that counsel for plaintiff in error made no statement that he had just been employed and had not had sufficient time to

prepare for the trial of the case, and no reason was given as to why the witnesses named had not already been subpœnaed, except the fact that the indictment had just been returned the day previously; and if counsel had just been employed, the motion for continuance should have so disclosed. Besides, the record discloses that many of the witnesses named in the motion for continuance were present and sworn, and testified in behalf of the plaintiff in error on the trial. So we are of the opinion that under the facts disclosed by the record, the judge did not abuse his discretion in refusing to grant a continuance.

■ The second special ground of the motion for new trial alleges error because the court admitted, over objection by the defendant, the testimony of M. S. Long, commissioner of Pickens County, who testified that he saw what he supposed was the body of Lee Cape, the deceased, and because all of the evidence of the said Long and his means of identifying the body of Cape "is vague, incompetent, and uncertain, and the identification is not positive;" the objection to said evidence being that "the proof of the corpus delicti in said case was a vital and important issue, and the State was bound to prove the same by competent evidence and positive identification." We are of the opinion that this ground is incomplete and without merit. From the record it is difficult to determine just what the nature of the objection was. Besides, the corpus delicti was abundantly established by other witnesses, both for the State and for the defendant. The coroner, who had known the deceased, and who prepared the body for burial, positively identified it as that of Lee Cape. Certain witnesses for the State and the defendant, who were present at the time of the homicide, testified as eye-witnesses, and stated where and how the deceased was killed.

■ In ground 10 of the motion error is assigned because the court permitted Surber Cape, a witness for the State, to testify that Lindsey Evans, one of the defendants indicted for the homicide of Lee Cape, knew him and also knew that he, Surber Cape, was a grandson of Lee Cape, the deceased. The ground of objection was that the witness could not testify what some other person knew. This objection is without merit. The witness testified positively to the fact objected to.

■ None of the other grounds which complain of the admission

of certain testimony show error. In a number of these grounds the assignment of error is so vague and indefinite as to raise no question for decision. We have carefully looked into all the grounds, and find no error in any of them.

■ The only other grounds which require elaboration are the general grounds. We have read the evidence in the case very carefully, and have reached the conclusion that the jury was authorized to find the defendant, Hoyt Evans, guilty of murder, with a recommendation to the mercy of the court, and that the court below, having approved this verdict, did not err in overruling the motion for new trial on any of the grounds set out therein, including the general grounds. The defendant, Hoyt Evans, a brother of Lindsey Evans (who, as the evidence of witnesses discloses, actually fired the shot that killed the deceased), was convicted of the crime of murder, with a recommendation. It is insisted by the plaintiff in error that the evidence is not sufficient to authorize the verdict; and in view of this contention we deem it proper to recite the main facts and certain testimony upon which the State relied for conviction. The record shows that Lee Cape, the deceased, was a prohibition officer, authorized to enforce the law against the distillation of liquor, and of having and selling liquor, in Pickens County. On Friday, September 16, 1927, G. M. Bell, a justice of the peace of Pickens County, issued to Lee Cape, the deceased, a search warrant for the purpose of searching the house of Carter Wilson, one of the defendants indicted. The evidence does not disclose any return of this warrant by Lee Cape, but it does disclose that, on the day on which the search warrant was issued, Harvey Dean, a witness for the State, saw Hoyt Evans with C. L. Smith, another defendant named in the indictment, on Henderson mountain at a distillery engaged in the manufacture of whisky. This still was a mile and a half or two miles from where Lindsey Evans lived, and about the same distance from where lived Calvin Wilson, the father of Carter Wilson, and a hundred or two yards further from the home of Carter Wilson. On Saturday, September 17, 1927, R. O. Hopkins, a Federal prohibition agent, in company with H. G. Jones and Wallace Wheeler, discovered on a branch on Henderson mountain a still which was ready to be operated; and on Thursday following the homicide the same officer discovered another still close by. The still first men-

tioned was about three quarters of a mile from the home of Lindsey Evans; and the second still, according to the testimony of Hopkins, was about a half mile from the home of Lindsey Evans. Grady Jones testified that Carter Jones, Carter Wilson, and Lindsey Evans, three of the defendants named in the indictment, lived on the same road in close proximity to each other. Calvin Wilson, the father of Carter Wilson, lived on the same road, between the homes of certain of the defendants. One of the defendants, C. L. Smith (otherwise known, according to the evidence, as "Seal" Smith), lived some distance from the defendants named in the indictment. According to the testimony of C. L. Smith, he went, on Friday, September 16, 1927, to the house of Lindsey Evans, and there met Hoyt Evans; and he was also present on Saturday, the 17th, at the place where the homicide occurred. Carter Jones, according to his testimony, lived on the place operated by Carter Wilson, who lived in the same neighborhood. On the day of the homicide he went to Carter Wilson's house, and there, with Carter Wilson and Lindsey Evans, went down the road towards Lindsey Evans's house, which was in the direction of the still previously mentioned. It appears that the homicide occurred in the road in front of the home of Carter Wilson, and all five of the defendants named in the indictment were present at the time of the homicide.

On the morning of September 17, 1927, according to the testimony of Surber Cape, a grandson of the deceased, he, Lee Cape, and Will Evans (who was not related to the defendants of that name) drove in a Ford touring-car near to the homes of Hoyt Evans, Carter Jones, Carter Wilson, and Lindsey Evans, turned to the left about fifty yards from Calvin Wilson's, and went to Henderson mountain, the place where the distilleries were located. Lee Cape, the prohibition officer, was left on the mountain with the understanding that he was later to meet his grandson, Surber Cape, and Will Evans at Carter Jones's about three o'clock in the afternoon. Three of the defendants named in the indictment were in a car riding on the same road as Surber Cape and Will Evans, and two of the other defendants were also in a car riding on the same road. When Lindsey Evans, Carter Jones, and Carter Wilson, riding in one of their cars, met with Surber Cape, Lindsey Evans, on recognizing Surber Cape, became very angry, and with-

out apparent provocation attempted to do Surber Cape bodily harm. Surber jumped from the car and ran, leaving the car. Dot Pharr, a witness for the State, testified that he went to get the car of Surber Cape, and was assaulted by Lindsey Evans; that when he got nearly down to where the car had been left, Lindsey Evans got out of the car in which he was riding, went to Cape's car, and said, "Here is this d— old s— of a b— 's car. I believe I will just take it off." It is insisted by the State, that, as Surber Cape was a boy sixteen years old, and Lee Cape was an older man about sixty years old, this testimony points to the conclusion that the three men in question were searching for Lee Cape, although some of the witnesses testified that his name was not mentioned. C. L. Smith, one of the defendants, not on trial, testified that he was at Lindsey Evans's house on the day of the homicide, just a short time before it occurred, and went from there to Carter Wilson's house with Hoyt Evans in a car; that when they reached the house of Carter Wilson they stopped, and Hoyt Evans got out of the car, saying that he wanted to see Wilson "about something," but did not say what that was. After the difficulty between Lindsey Evans and Surber Cape, the car in which Lindsey Evans, Carter Jones, and Carter Wilson were riding went down the road towards Uless Barron's, and turned around and came on back to the house of Lindsey Evans; and that when they reached the house of Lindsey Evans it was late in the afternoon. Lindsey Evans, whose house was some distance from the road, went into the house, got a double-barreled shotgun, and fired it twice. In traveling up the road Lindsey Evans and his two companions passed Lee Cape in the road; and one of the defendant's witnesses, who was in the car at the time, testified that Lindsey Evans wanted to get out and talk to Mr. Cape, but he just drove on to Carter Wilson's house. In a short time all five of the defendants were present at Carter Wilson's house.

What occurred at the time of the killing was told by C. L. Smith, a witness for the defendant. He testified, among other things: "Mr. Cape got back down there just about the time Hoyt got back, or might have beat Hoyt back a little bit; and he asked whose car that was, and Hoyt told him it was his'n. He said he wanted to search it, and Hoyt told him, all right, to help himself. I crawled out and sat down on the bank and he went to searching

it. He looked under the seat and tried to get under the back end there, and he hadn't raised it up good, and Hoyt asked him if he wanted him to help him, and Hoyt pulled it up and looked in it, went back and looked under the hood, and looked there and came back there, and he says ' How do you get in there ? You know there is a little place in behind the seat about that board.' And Hoyt just laughed and said, 'I don't know, Mr. Cape, I never have been in there;' and he started around the front of the car, and Lindsey, he just come up and got up and stepped back kind a towards the back end of it there, and says, 'If you tear it up, by God, you will have to pay for it.' Mr. Cape said, 'Well, that would be very easy done, I guess. You have been trying to run ablazin around all the time; nobody ain't scared of you.' That's about the words Mr. Cape said; and then he shot. Then Lindsey got up and commenced raising his gun that way [indicating], and, the best I could see, Mr. Cape was kind a standing sideways towards him, and he raised his gun, and about the time he got it up to his face I looked down the road. When he shot I looked back, and Mr. Cape was down on his face in that ditch." On cross-examination he testified: "I saw the boy raise the gun, and I just turned my head, for I didn't see the person fall. There was two more shots. I didn't know where they hit. I knew that much. I knew when I came out of the house Mr. Cape wasn't there in the road. He was gone. I did not know which way he went. I could hear the car crank up, heard it when he went up the road. He was gone from out there. I don't know who was in the car. Lindsey Evans wasn't there when I got back out to the road. I knew Mr. Cape was dead and was moved away from where he was shot. I had an idea he was carried away in the car, from. the way he was fixing up; he raised up the back end. I heard the car crank up, and he was gone when I went back there; the blood and the dog are all I say I saw."

The defendant made a statement in which he said, among other things, "I didn't see him [Lindsey] shoot the first time. I mean just actually shoot him. When the gun fired Mr. Cape fell on the side of the road, and I grabbed the gun. He says ' G— d— you, turn it loose, or I will shoot you;' so I turned it loose, jumped in the ditch, run towards the house. Smith, he went across the road. I don't know where Smith was at the time, didn't pay any atten-

tion to where he was when he shot. I got in the hollow, and he said something another, said ' G— d— you, don't you leave me,' or, ' Stop, or I will shoot,' or something another. Well, I didn't plumb stop. I just kind a looked back like that [indicating], and just kept easing along, because I know Lindsey, know his disposition. . . So Lindsey—I was over there at the car. I didn't think about him going to carry this man off in the car, didn't think of it at all, didn't dream of such a thing as that; so I heard the lid fall. I heard him trying to hook it. I turned and asked him, I says, ' Don't take him away, Lindsey.' He said something another back at me, right low, something another—I didn't understand what he said. I stepped outside the yard fence, asked him not to do it again. He said ' Shut your d— mouth,' or something another like that. . . I says, ' He is going to carry the man,' or ' done gone.' Well, I didn't know what to do, I was excited. It was a quick thing with me. I didn't know a thing in the world about it, just on the spur of the moment with me. I didn't know, so I went on then behind him. He had already gone with my car. I went in behind him, got out there to Mr. Wilson's, and got his car and went right on down the road, and I run up behind him, I think about Harvey Jones's, I think, and I opened to run, and when I opened to run it seemed like he opened up, went right on down the road, and the last time I saw Lindsey was when he went into the highway over there at John Clark's, the last time I saw him in my car."

The evidence discloses that the defendant Hoyt Evans followed his brother, Lindsey Evans, in the last car, and that he procured gasoline for his car. An automobile mechanic testified that, while examining the car underside, he discovered blood dripping from the rear end of the car. Another witness testified that blood was discovered in the defendant's car after it had returned from taking the body off; that the deceased was a man weighing about 175 or 180 pounds; and that one man alone could not have handled the body by placing it in the automobile, before rigor mortis set in. Weldon Wilson, for the State, testified: "I am related to Carter Wilson. We are brothers. I remember the time Mr. Cape was killed, September 17, 1927, in Pickens County, something like an hour by sun. I saw who killed him. Lindsey Evans killed him with a shotgun. There were three guns fired. I saw the

effect of the first shot. I saw Lindsey and Lee Cape standing kinder by the side of the car, at the back of it kinder; they was both standing there when I first saw them, and Mr. Cape walked behind the car out of my sight, and about that time I heard a gun fire, and I saw him fall up against the other bank of the road. I saw Lindsey when the gun fired, and I saw Cape fall at the first shot. He fell there against the bank, in the edge of the road. This was near Carter Wilson's house, something like 45 steps from the road to the door of his house. The car that Cape was standing at the back of, when he was shot, was supposed to be Hoyt Evans's car. I know that it was the car that Hoyt Evans had been driving all the while. When Evans fired the first shot he walked behind the car, and he wasn't over two or three steps, if that far, from him then. The road is barely wide enough for two cars to pass, as it is. I saw Evans fire the second shot. I couldn't see Mr. Cape at that time, and I don't know what his position was, and the effect of the second shot. He had done fell, and was low down when the shot was fired. I didn't see him any more. Besides Lins Evans, there was in the road at that place, about that car, at that time, Mr. Cape, Hoyt Evans, and Seal Smith. I saw nobody else. After Lins shot the three shots I saw him raise the back of Hoyt's car, and he took hold of Mr. Cape and went to pulling him up; and so I turned off and never watched any longer." The body of the deceased was found on Monday morning, two days after the homicide, about forty miles from where the homicide occurred, in a pine thicket, with the head severed from the body (which was nude, except a pair of socks), the head being on one side of the road and the body on the other. The head and body were identified by witnesses who had known the deceased in his lifetime.

While the evidence as to the defendant is in part circumstantial, we are of the opinion that it was sufficient to authorize the verdict, and the judge, who tried the case and saw and heard all the witnesses, being satisfied with the evidence, we are of the opinion that he was authorized to refuse a new trial on any of the grounds of the motion.

*Judgment affirmed. All the Justices concur, except Russell, C. J., who dissents.*